No. 21853.

DEANE BUICK COMPANY AND ROYAL INDEMNITY COMPANY
*v.* WILLIAM L. KENDALL, DECEASED; JANE KENDALL;
AND THE INDUSTRIAL COMMISSION OF COLORADO.
(417 P.2d 11)

Decided July 18, 1966.    Rehearing denied August 8, 1966.

ZARLENGO, MOTT and CARLIN, for plaintiffs in error.

STANLEY W. PRISNER, DUKE W. DUNBAR, Attorney General, FRANK E. HICKEY, Deputy, PETER L. DYE, Assistant, for defendants in error.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the court.

WE refer to plaintiff in error, Deane Buick Company, as the employer; to Royal Indemnity Company as the insurance carrier; to the claimant Jane Kendall as the claimant; and to defendant in error The Industrial Commission of Colorado as the Commission. The claimant received an award under the Workmen's Compensation Law for the death of her husband, which award was affirmed by the district court. The employer and the insurance carrier seek to reverse the award of the Commission by this writ of error.

William Kendall, husband of claimant, was a new car salesman for Deane Buick Company. Except for the times when he was required to attend sales meetings which were held on the employer's premises at about 8:15 A.M., or when he was assigned to take his turn on the floor, he was not required to stay on the premises, and was given a free hand as to where he performed his duties as a salesman. All the salesmen were furnished with an "owner follow-up record" by the employer, and were also furnished with automobiles which they could use as their own. Kendall kept a card index containing the names, addresses and telephone numbers of customers and prospective customers. These were his to keep wherever he desired, and were in fact kept in a "highboy" in the bedroom of his home.

Claimant testified concerning the habits of her husband when he came home during working hours, as follows:

"A. Well, he would come home if he had forgotten

a number, or people did call Mr. Kendall at home. And if he had forgotten to take that, if he had changed his suit and forgotten his cards or his business cards, anything like that, that would be the time that Mr. Kendall would come home."

On the morning of December 11, 1963, Kendall had attended a sales meeting. He called his wife about 9:00 or 9:15 A.M. that day. The record reflects the following testimony by claimant, which was strenuously objected to by the respondents:

"Q. What, if anything, did Mr. Kendall tell you during the course of that phone call conversation?

"A. Mr. Kendall called and told me not to get myself cleaned up to go out to take our granddaughter to our daughter, that he had to come home anyway for — I am sorry, I don't know whether he said papers or numbers. The word just will not come. I don't know.

"Q. Papers or numbers?

"A. He said he had to come home.

"Q. I see. And, therefore, he told you he would pick up somebody else?

"A. He would pick up our daughter and bring her down.

"Q. I see. Very well. Now, did you see Mr. Kendall later that morning?

"A. Yes, sir.

"Q. And where did you see him?

"A. Well, Mr. Kendall brought our daughter home, and I saw him at that time.

\* \* \*

"Q. Now, he walked into where?

"A. He walked into our bedroom.

"Q. Yes, ma'am.

"A. He turned around and came out, and I asked him if he wouldn't like just a cup of coffee, or couldn't he stay for lunch. He said, no he had to get right back to work.

"Q. About how long would you say he spent in the bedroom, if you can estimate?

"A. I have — oh, I would say maybe three, four, five minutes. I really don't know."

She further testified that he went out the front door, came back about two minutes later covered with snow. He had suffered injuries as the result of a fall. Following a phone call to the doctor he went to the doctor's office and after an examination the doctor sent him to St. Luke's Hospital for X-rays. He was then returned to his home where, pursuant to the doctor's instructions, ice packs were placed on his head. They retired about 1:00 A.M. the following morning and about 2:00 A.M. he was unconscious. The doctor was again called; Kendall was taken back to the hospital and never regained consciousness and passed away January 17, 1964.

Under cross-examination as an adverse witness, Joseph Fadely, General Manager for the employer, testified as follows:

"Q. Now, outside of the time when he was to attend sales meetings, or to do floor time at the plant, was he required to stay on the premises?

"A. Absolutely not.

"Q. Did you give him a free hand as to where he could perform his sales duties?

"A. Anywhere he saw fit.

"Q. The purpose was to sell Buicks, I take it?

"A. Sell Buicks.

"Q. Do you know anything about the nature of his clientele in your employ sir?

"A. Bill had a vast number of friends, sold an awful lot of friends. Sold relatives, neighbors of relatives, neighbors of his. I felt that the minute Bill saw somebody, he was talking Buicks.

"Q. I see. Now, was Mr. Kendall required to check in, or check out of the plant?

"A. No, Bill was on his own, completely, with the exception of the floor schedule."

The death certificate shows that the cause of Kendall's death was "Intracerebral hematoma, traumatic, rt. frontal lobe, incurred on 12-11-63." The evidence is clear that Mr. Kendall was injured as a result of an accident suffered by him at or near his home about 10:30 A.M. on December 11, 1963, and that he died as a result of that accident.

■ As grounds for reversal of the judgment it is argued that the testimony of claimant, as to the purpose of Kendall's being home at the time of the accident, was heresay and that there is no competent evidence to show that decedent was in fact so engaged at the time of the accident. In this connection we would call attention to the testimony of claimant that Kendall kept certain papers in connection with his employment at home, and that it was when he had forgotten some of those documents that he would come home during working hours. The case of *Williams v. New Amsterdam*, 136 Colo. 458, 319 P.2d 1078, relied on by the employer and the insurance carrier, is clearly distinguishable upon the facts.

■ *Alexander Film Company, et al. v. Industrial Commission of Colorado, et al.*, 136 Colo. 486, 319 P.2d 1074, was a workmen's compensation case in which the claimant's husband made a statement to one, Carrier, "that he was returning to the motel (an hour's distance from the proving grounds) for the purpose of revising the next day's script." He met with an accident and was killed. From the opinion in that case we quote the following pertinent language:

"Were the statements of the deceased to Carrier, relating what he intended to do that evening, inadmissible because hearsay? We think that statements wearing the badges present here are within an exception to the hearsay rule and admissible. Here their admissibility depended on (1) whether they related to a then existing state of mind. (*Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 12 S. Ct. 909, 36 L.Ed. 706), (2) whether they were

made in the ordinary course of things as the usual information a man would communicate to another under the circumstances (*Hunter v. State,* 40 N.J.L. 495), and (3) whether they were 'made under circumstances which would exclude any suspicion of an intention to make evidence to be used at the trial' (*Commonwealth v. Trefethen,* 157 Mass. 195, 31 N.E. 961).

"Sanction for the admission of such statements as original evidence forming an exception to the hearsay rule has gradually grown in the law of evidence. As a result there is today a solid body of authority enunciating the rule that relevant ante-incident statements of intention to do some act are admissible as original evidence. *State v. Journey,* 115 Conn. 344, 161 Atl. 515; *State v. Long,* 32 Del. 380, 123 Atl. 350; *Mathews v. Great Northern R. Co.,* 81 Minn. 363, 84 N.W. 101, 83 Am. St. Rep. 383; *Lewis v. Lowe & Campbell Ath. Goods Co.,* (Mo.) 247 S.W. (2d) 800; *Ervin v. Myrtle Grove Plantation,* 206 S.C. 41, 32 S.E. (2d) 877, are a few typical decisions. See also 113 A.L.R. 288 and Wigmore on Evidence (3rd Ed.), §1725.

\* \* \*

"The doctrine that statements of design or plan are admissible as original evidence, when attended by the three elements above outlined (a present existing state of mind, something said in the usual course of things under the circumstances, and under circumstances excluding an ulterior purpose), represents no radical departure from the previous law on the subject. In adopting the doctrine, we hold that the declarations of Mr. Olson, made on the afternoon before he was fatally injured, were properly admitted in evidence. Having properly received the statements in evidence, the Commission could with propriety, as it did, infer that Mr. Olson was at the time of the injury crossing the road to his motel 'to pursue his duties for several hours before retiring.' "

■ In the instant case the award of the Commission

has sufficient support in the evidence, and the judgment. of the district court upholding the award is affirmed..

MR. CHIEF JUSTICE SUTTON not participating.