**The PEOPLE of the State of Colorado, Plaintiff-Appellee,**

v.

**Alfred MADSON, Defendant-Appellant.**

**No. 80SA370.**

Supreme Court of Colorado, En Banc.

Nov. 16, 1981.

Rehearing Denied Dec. 7, 1981.

---

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., David K. Rees, Asst. Atty. Gen., Denver, for plaintiff-appellee.

J. Gregory Walta, Colorado State Public Defender, Harvey M. Palefsky, Deputy State Public Defender, Denver, for defendant-appellant.

QUINN, Justice.

The defendant, Alfred Madson, appeals from his conviction of murder in the first degree after deliberation. Section 18–3–102(1)(a), C.R.S.1973 (1978 Repl.Vol. 8).[1]

1. The appeal was originally filed in the Court of Appeals but was transferred to this court pur-

He challenges the conviction on several grounds including the sufficiency of evidence to support the jury verdict, the admission into evidence of several statements made by the victim to others under the state of mind exception to the hearsay rule, the claimed unconstitutionality of Crim.P. 41.1 which authorizes a judicial order for nontestimonial identification evidence on less than probable cause, and the constitutional propriety of admitting statements and other evidence which the police obtained from him during the initial phase of the investigation.[2] Although we conclude the charge of murder in the first degree was properly submitted to the jury, we reverse the defendant's conviction because of the admission of prejudicial hearsay evidence during the trial and we remand for a new trial. Since a new trial is required, we elect to address the suppression claims of the defendant in order to provide necessary direction to the trial court upon remand.

## I. *The District Court Proceedings*

The defendant was charged with intentionally and after deliberation having caused the death of Geneva Josephine Van Hee on December 24, 1977. At approximately noon on December 26 Ms. Van Hee's body was discovered in the front passenger seat of her 1974 Chevrolet Vega automobile in a parking lot behind the Kit Carson Hotel in La Junta, Colorado. Her body was frozen and leaning toward the center console of the vehicle. A gunshot wound to the head was the obvious cause of death.

Investigating officers of the La Junta Police Department received information from Khip Turley, who was Ms. Van Hee's adult daughter, and Jessie Roberts, a close friend of the victim, that on the afternoon of December 24 the victim had been at Cap's Bar in the company of the defendant whom she had dated on several occasions. Cap's Bar, located on Second Street in La Junta, is diagonally across the street from the parking lot where the victim's body was found. Khip Turley informed the police that her mother was fearful of the defendant and had been threatened by him. Ms. Roberts told the officers that the defendant and the victim had an argument in the bar over their continued relationship and after the argument the victim told her that she was afraid of him.

Based on this information several officers went to the defendant's apartment in La Junta at approximately 5:30 p. m. on December 26.[3] After informing him that they were investigating the death of Ms. Van Hee, they asked to speak to him. The defendant invited the officers inside and, after being advised of his *Miranda* rights,[4] he expressed his willingness to talk to the officers. He told the officers that he left Cap's Bar at approximately 4:00 p. m. on December 24. Upon being questioned about a sweater allegedly worn by him on December 24, he stated that he had discarded it on December 21 after it had become soiled with grease from his automobile. While the officers were in the apartment he executed a written consent to search his apartment and automobile.[5]

suant to sections 13–4–102(1)(b) and 13–4–110, C.R.S.1973, because of the defendant's constitutional challenge to Crim.P. 41.1.

2. The defendant's other claims which we do not address include: the failure of the court to grant the defendant's motion for a mistrial because of certain hearsay statements, offered in contravention of the court's ruling, to establish the defendant's jealous attitude towards the victim; the court's failure to instruct on alibi on its own motion; the court's failure to instruct on lesser offenses; the court's failure to instruct the jury that it must find the defendant's statements to the police to have been voluntary before it could consider them as evidence; the court's failure to credit the defend-

ant with 186 days of presentence confinement; and the claimed violation of the defendant's right to effective assistance of counsel due to the failure of his privately retained lawyer to conduct an adequate investigation prior to trial.

3. Evidence at the suppression hearing indicated that there were from three to five officers at the defendant's apartment during the search.

4. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5. The search proved unproductive of any significant evidence. The police took a pair of black shoes from the apartment but the shoes were not offered into evidence at trial.

After completing the search the officers requested the defendant to accompany them to the station house for fingerprinting and further questioning. He agreed and at the police station he was questioned about the shoes he was wearing. He stated they were the same shoes he wore on December 24 and allowed the officers to examine them. In response to an officer's statement about the appearance of blood on one of the shoes, he replied, "If you say it is blood, it is blood." The police retained the shoes and the defendant then was permitted to leave the station house.

Subsequent police investigation disclosed that one Alfonso Whatley had been at Cap's Bar during the afternoon of December 24. Whatley was acquainted with Ms. Van Hee and also knew the defendant by sight. While at the bar he observed them arguing and later saw Ms. Van Hee driving her Vega automobile westbound on Second Street with the defendant riding as a passenger in the front seat. Still later, near dusk on December 24, Whatley saw the defendant alone in an alley near the parking lot across the street from Cap's Bar.

On December 30 the district attorney filed an application for nontestimonial identification evidence, supported by an affidavit relating the details of the investigation to date.[6] Pursuant to Crim.P. 41.1, the court issued an order authorizing the police to take the defendant into custody for the purpose of obtaining various forms of identification evidence, including a photograph and a handwriting exemplar.[7] The defendant was taken into custody on December 31, the court order was executed, and thereafter he was released. On January 3, 1978, Alfonso Whatley was again interviewed by police officers and he identified the photograph of the defendant as the man he ob-

---

6. The affidavit in support of the application stated in part:

"1. Affiant is Sergeant of the La Junta Department of Public Safety, Otero County, State of Colorado;

"2. On December 26, 1977, officers from the La Junta Police Department of Public Safety were called to the parking lot behind the Kit Carson Hotel at 2nd and Colorado, La Junta, Otero County, Colorado, to investigate a report that Mrs. Geneva Van Hee had been found dead in her car;

"3. Subsequent investigation by La Junta Department of Public Safety Officers, specifically, the affiant, revealed the following facts:

A. Mrs. Van Hee was dead from a single gunshot wound to the head, apparently inflicted while she sat in her car;

B. At the time her body was discovered, the doors to her car were locked and no gun was found;

"4. In the ensuing investigation, the affiant developed the following information concerning Alfred Madsen aka Alfred Madson:

A. Alfred Madsen and Mrs. Van Hee were frequent social companions;

B. Alfred Madsen has previously been convicted of murder, for which he served 20 years in the Colorado State Penitentiary;

C. Mrs. Van Hee had remarked to several of her friends that she was 'afraid' of Alfred Madsen;

D. Alfred Madsen was drinking in the same bar with Mrs. Van Hee on Saturday, December 24, 1977; he left the bar shortly after she did and that was the last time she was seen alive;

E. Witnesses who saw Alfred Madsen in the bar on December 24, 1977 said that he had been wearing a blue and white hand-knit sweater; Madsen stated to the affiant that he had destroyed that sweater sometime during the week prior to December 24, 1977;

F. The affiant believes that whoever shot Mrs. Van Hee was sitting in the driver's seat of her car at the time and was likely to have gotten her blood on his clothing.

"5. The affiant has obtained several items of evidence through the course of his investigation which need to be compared with samples taken from both victim and suspect. This evidence included:

A. Hair and blood samples from the interior of Mrs. Van Hee's car;

B. An unsigned letter from Mrs. Van Hee's house, discussing the author's relationship with Mrs. Van Hee;

C. Cigarette butts from three different brands of cigarettes, taken from the ashtray in Mrs. Van Hee's car;

D. Fingerprints taken from the interior of Mrs. Van Hee's car;

E. Witnesses who are believed to have seen Mrs. Van Hee driving in her car late Saturday afternoon, December 24, 1977, with an unidentified male passenger."

7. The order also authorized the taking of samples of the defendant's hair, blood and saliva, fingernail scrapings, and fingerprints. Only the handwriting exemplar was offered and admitted into evidence at the defendant's trial.

served on December 24 in Ms. Van Hee's automobile and later in the alley near the parking lot.[8] The defendant was arrested on January 6, 1978, and charged with murder in the first degree.

Prior to trial the defendant moved to suppress his statements made to the police, his shoes and any tests performed on them, and also the handwriting exemplars obtained pursuant to the court's order for nontestimonial identification evidence. The court denied the motion to suppress statements, concluding that the police fully advised the defendant of his *Miranda* rights and the defendant knowingly, intelligently, and voluntarily waived those rights. It granted the defendant's motion to suppress the shoes and the chemical tests conducted thereon because the defendant had not voluntarily consented to the retention of the shoes by the police. This court reversed the trial court's suppression order in *People v. Madson*, 196 Colo. 507, 586 P.2d 1338 (1978), holding that the defendant voluntarily consented to the search of his shoes and thereby waived any objections to their retention by the police. With respect to the handwriting exemplar, the court denied the motion to suppress on the basis that the requirements of Crim.P. 41.1 had been fully satisfied. In its suppression ruling the trial court did not determine whether the defendant's statements to the police on December 26 and the retention and testing of his shoes were the fruits of an illegal arrest or detention in violation of the Fourth Amendment, although this issue was raised and argued at the suppression hearing.

At trial several prosecution witnesses placed the defendant and the victim at Cap's Bar on the afternoon of December 24 and testified to seeing them arguing at that time. Jessie Roberts described how, while the defendant was still in the bar, she left with the victim at about 3:45 p. m. and walked with her a short distance towards the Vega automobile. There was evidence establishing that the defendant left the bar sometime later, returned to the bar about 4:35 p. m. and then left again with a male companion close to 5:00 p. m. Alfonso Whatley recounted his observations of the defendant and the victim riding in her vehicle later in the afternoon and then his subsequent sighting of the defendant near dusk in an alley next to the parking lot across from Cap's Bar.

The prosecution offered into evidence and the court admitted defendant's statements to the police on December 26. Also admitted into evidence was a letter found by Khip Turley in her mother's apartment shortly after her body was discovered. The letter, undated and unsigned, was identified by an expert witness as having been written by the defendant. Although not overtly threatening, it expressed hostility and jealousy toward the victim because of her ongoing relationships with other men. The following excerpts depict its overall tone:

"I dont know why I'm writing this, still being stupid I guess.

"If your game was to break my heart you did.

\* \* \* \* \* \*

"The plain and simple truth works with me. If you only wanted me for a fill in you should have said so. Mondays Sams nite, tues. wed. Babes nite. thur fri Rays nite. Sat Sun maybe Als nite.

"Not let me hang around and become hooked and convinced that you cared some for me.

\* \* \* \* \* \*

"You told me that you didnt want to get hurt, and didnt want to hurt me. Well the plain truth would have saved me from being hurt. You pulled all kinds of shadey tricks that I let slid as much as I could.

8. The district attorney confessed the defendant's motion to suppress the photographic identification by Mr. Whatley due to the suggestive procedures utilized in obtaining his identification. The trial court suppressed Whatley photographic identification but found that any in-trial identification would be based on an independent source, namely his prior contacts with the defendant, and denied the defendant's motion to suppress the in-trial identification. The defendant does not challenge the trial court's ruling in this respect.

"You told me that you spent the day with Ray and told him it was all over. And would still be friends.

"It just makes sence that if you cared for me as you said there was no reason to be mad, if he had been put off.

"The one you care for comes first, before a put off the list friend.

"You also said that you had told your daughter you cared and might be getting serious with Al.

"So who do you care for? the dumb act took place in a bad spot, Because it was the only place he would stand still. He acted guilty of being caught.

"You confuse jealously with Loyality. Who were you loyal to? Not Al.

"Yet he has done everything possible to show and prove his loyalty to you.

"You prove loyalty first then there is no room for jealously. As loyality is a trust.

\* \* \* \* \* \*

"You plead guilty in public view. of how much I ment to you."

A forensic chemist for the Colorado Bureau of Investigation described chemical tests performed on the defendant's shoes and identified human blood on the instep and sole of the right shoe. The coroner-physician who performed an autopsy on the decedent attributed the cause of death to a gunshot wound behind her left ear. The bullet shattered her skull and fragmented in several parts which lodged inside her brain and sinus. However, the frozen condition of the victim's body prevented the physician from fixing a precise time of death.

Much of the prosecution's case consisted of testimony of several witnesses who related the victim's statements to them about her fear of the defendant. The trial court overruled the defendant's objection to such evidence. Although the court rejected the evidence as probative of intent or motive on the part of the defendant, it ruled that "the victim's state of mind is patently relevant as to whether or not death was caused by a criminal agency" and "mental attitude negates any theory of suicide." The court accordingly admitted the evidence and orally instructed the jury to consider it for the limited purposes of showing the victim's state of mind and establishing that death was caused by a criminal agency.[9] Following the court's ruling Jessie Roberts was permitted to testify to the following conversation she had with the victim in Cap's Bar on the afternoon of December 24:

"Q Did [the victim] say anything to you about the defendant at this time?

"A Well, when I first went around and sat down by her, she told me he was so mad he could kill her.

"Q Did you have any further conversation that afternoon with her about Mr. Madson?

"Certain evidence was admitted for a limited purpose.

"At the time this evidence was admitted you were admonished that it could be considered by you only for the limited purpose of showing the deceased's state of mind.

\* \* \* \* \* \*

"You are again instructed that you must not consider such evidence for any purpose except the limited purpose for which it was admitted."

We assume the reason for the omission of any reference to criminal agency in the written jury instruction was because the court considered the victim's state of mind relevant to the negation of suicide. In any event, as discussed in Section III, *infra*, it was error for the court to admit the victim's statements for either purpose.

9. Before each of the victim's statements was admitted the court orally instructed the jury on the limited purposes of the evidence as follows:

"In certain instances evidence may be admitted for a particular purpose only, and for no other. The testimony of [witness] which you are about to hear insofar as it may relate to statements made by the decedent to her, is such an instance. It may be used as evidence for the limited purpose of showing the decedent's state of mind. It may be relevant to whether or not death was caused by an outside criminal agency, and you should consider it for no other purpose. For that limited purpose you may give it such weight as you think it is entitled to."

At the conclusion of the evidence the court's written instruction to the jury limited the hearsay evidence to the victim's state of mind. The written instruction stated in pertinent part:

"A Yes, she was scared."

Another witness, Betty Fleming, related her conversations with the victim over a period of several weeks prior to December 24. The victim had told this witness she was afraid of the defendant and "if she came up missing . . . look for her in the trash cans." The prosecution also presented testimony from still another witness, William Fleming, about the victim's statement that the defendant "was so mad at her he could kill her . . . and check the trash cans if she came up missing." Khip Turley, the victim's daughter, described a conversation on Thanksgiving Day 1977 in which her mother attributed the following statement to the defendant: "He said, I've killed before, I will kill again, if I have to." Further testimony by Khip Turley described a statement her mother made to her on December 22 in which she (her mother) expressed once again her fear of the defendant and stated, "If you can't find me, start looking in the trash can, you can't tell what some silly old fool will do."

At the conclusion of the prosecution's case and at the end of all the evidence [10] the defendant moved for a judgment of acquittal. The court denied the motion on both occasions. The jury returned a verdict of guilty as charged. The defendant was sentenced to life imprisonment and this appeal followed.

## II. The Sufficiency of the Evidence

We first address the issue whether there was sufficient evidence to warrant the submission of murder in the first degree to the jury. The defendant concedes the evidence is sufficient to prove he killed the victim. He argues, however, that Colorado case law expressly rejects a presumption of deliberation from the use of a deadly weapon and, without resort to such presumption in this case, the evidence was insufficient as a matter of law to support a conviction for murder "after deliberation." We disagree with this argument.

Section 18–3–102(1)(a), C.R.S.1973 (1978 Repl.Vol. 8), states:

"(1) A person commits the crime of murder in the first-degree if:

(a) After deliberation and with the intent to cause the death of a person other than himself, he causes the death of that person or of another person."

As employed in this statutory definition the term "after deliberation" means

"not only intentionally [11] but also that the decision to commit the act has been made after the exercise of reflection and judgment concerning the act. An act committed after deliberation is never one which has been committed in a hasty or impulsive manner." Section 18–3–101(3), C.R. S.1973 (1978 Repl.Vol. 8).

■ Prior to the enactment of the Colorado Criminal Code, this court held in a long line of cases that the use of a deadly weapon, by itself, is not sufficient to establish the express malice formerly required for murder in the first degree. *E.g., People v. Morant*, 179 Colo. 287, 499 P.2d 1173 (1972); *Hervey v. People*, 178 Colo. 38, 495 P.2d 204 (1972); *Power v. People*, 17 Colo. 178, 28 P. 1121 (1892); *Kent v. People*, 8 Colo. 563, 9 P. 852 (1885); *Hill v. People*, 1 Colo. 436 (1872). These cases stand for the proposition that the essential culpability for first degree murder cannot be determined on the basis of a presumption of law. Rather, the requisite culpability must be proven as a matter of fact. Justice Hallett made this point in *Hill v. People, supra*, where the defendant's conviction of first degree murder was reversed due to a jury instruction which, in effect, created a presumption of premeditated and deliberate murder from the use of a deadly weapon:

10. The defendant's evidence consisted of three witnesses who testified to his whereabouts from approximately 5:00 p. m. on December 24 to 6:00 p. m. on December 26, except for 20 minutes on Christmas morning. The defendant elected not to testify in his own defense.

11. "A person acts 'intentionally' or 'with intent' when his conscious objective is to cause the specific result proscribed by the statute defining the offense." Section 18–1–501(5), C.R.S. 1973 (1978 Repl.Vol. 8).

"The statute has not declared that homicide, effected by means of a deadly weapon, shall be punished with death, but deliberate or premeditated homicide is so punishable; therefore, the ultimate point which the evidence must extend to and establish, is not the use of a deadly weapon, but the deliberation or premeditation with which the fatal act is done, and whether the intention is shown by evidence of antecedent menaces, former grudges, lying in wait, the means employed to effect the homicide, or any other circumstances which may give assurance of it, I think that it is to be submitted to the jury to find the fact under the direction of the law." 1 Colo. at 448. We again reaffirm this principle. Under the present statutory scheme the use of a deadly weapon, by itself, is not a sufficient basis to presume the critical element of deliberation.

■ Although the use of a deadly weapon does not give rise to a legal presumption of deliberation, this is not to say that the court may not consider the circumstances attending the killing in determining whether sufficient evidence exists for submission of the issue of deliberation to the jury. The element of deliberation, like intent, can rarely be proven other than through circumstantial or indirect evidence. Thus, evidence of the manner in which the weapon is used may furnish some proof of the requisite culpability for first degree murder. *See Hampton v. People*, 171 Colo. 153, 465 P.2d 394 (1970); *People v. Spinuzzi*, 149 Colo. 391, 369 P.2d 427 (1962); *Power v. People, supra*. Additional proof may take the form of enmity, hostility, jealousy, or other manifestations of ill will between the accused and the victim. *See, e.g., People v. Miller*, 187 Colo. 239, 529 P.2d 648 (1974); *Berger v. People*, 122 Colo. 367, 224 P.2d 228 (1950); *Power v. People, supra*. In the last analysis the issue of evidentiary sufficiency depends upon a weighing of the probative strength of the evidence against the culpability element to which it relates. The critical inquiry in this case, therefore, is whether the evidence, when viewed in a light most favorable to the prosecution, is substantial and sufficient to permit a reasonable person to conclude beyond a reasonable doubt that the defendant intentionally caused the death of Ms. Van Hee and that the decision to kill was made after the exercise of reflection and judgment. *See, e.g., People v. Bennett*, 183 Colo. 125, 515 P.2d 466 (1973).

■ The circumstances surrounding the victim's death permit the reasonable inference that the defendant fired a pistol at close range into her skull in a manner clearly intended to cause death. Additionally, his letter to the victim evinces a pronounced hostility and jealousy consistent with an underlying resentment over her dating other men. The argument in Cap's Bar on December 24 is further evidence of the deteriorating nature of their relationship. Since the victim had left the bar some period of time before the defendant was later seen riding with her in her automobile, the jury reasonably could conclude that the defendant had sufficient time for the exercise of reflection and judgment concerning the fatal act. *See, e.g., People v. Sneed*, 183 Colo. 96, 514 P.2d 776 (1973); *People v. Maes*, Colo.App., 609 P.2d 1105 (1979). Although the issue is a close one, we believe the totality of evidence, when appropriately viewed, was sufficient to warrant the submission of the crime of first degree murder to the jury.

### III. The Hearsay Evidence on the Victim's State of Mind

We proceed to consider the admissibility of testimony from several witnesses recounting the victim's assertions to them about her fear of the defendant. The basis of the admission was that the statements tended to show the decedent's state of mind as it related to the criminal character of the homicide. We conclude that the admission of this evidence constituted reversible error.

### A.

■ Hearsay is testimonial or written evidence of an out-of-court assertion which is offered to prove the truth of the matter

asserted. V *J. Wigmore, Evidence* § 1361 (Chadbourn ed. 1974); *C. McCormick, Evidence* § 246 (1972). The primary basis for excluding hearsay evidence is the lack of opportunity to subject the declarant to cross-examination.[12] V *J. Wigmore, supra*, § 1362; *C. McCormick, supra*, § 245. Exceptions to the general rule of exclusion stem from considerations of trustworthiness and necessity. Under the state of mind exception, assertions about the declarant's state of mind are admissible to prove the truth of the matter asserted.[13] *See, e.g.* VI *J. Wigmore, supra*, §§ 1714–15, 1730 (Chadbourn ed. 1976); *C. McCormick, supra*, § 294. Spoken words provide a reliable and often the only access to the speaker's thoughts, and in the case of a homicide victim's assertion the element of necessity is obvious.

█ Since the state of mind exception admits the assertion for the truth of the matter asserted, it is basic to admissibility that the assertion essentially depict the declarant's then existing state of mind, as distinguished from a description of the acts or state of mind of another. *E.g., Shepard v. United States*, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933); *People v. Purvis*, 56 Cal.2d 93, 362 P.2d 713, 13 Cal.Rptr. 801 (1961); *State v. Kump*, 76 Wyo. 273, 301 P.2d 808 (1956). A declaration of present state of mind is one which describes a state of mind at the time of the declaration. *C. McCormick, supra*, § 294. Thus the statement "I fear X" is direct evidence of the declarant's fear of X. The state of mind exception encompasses statements of the declarant's present intent to engage in future conduct as proof of the subsequent act. *E.g., Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892); *Deane Buick Co. v. Kendall*, 160 Colo. 265, 417 P.2d 11 (1966). For example, the statement "I am going out with X tonight" may be offered as circumstantial evidence that the declarant engaged in conduct in keeping with the expressed declaration.

█ Excluded from the state of mind exceptions are statements of memory or belief such as "I had a fight yesterday with X." *Shepard v. United States, supra,* illustrates the danger posed by such statements. There, in a murder prosecution, the trial court admitted testimony that the victim, the wife of the physician-defendant, had stated to a nurse, "Dr. Shepard has poi-

---

**12.** Other reasons for the general exclusion of hearsay evidence include the absence of an oath when the declaration was made and the inability of the trier of fact to observe the declarant's demeanor. V *J. Wigmore, Evidence* § 1362 (Chadbourn ed. 1974).

**13.** Courts and commentators have noted substantial confusion surrounding the resolution of issues involving the state of mind exception. *See, e.g., United States v. Brown*, 490 F.2d 758 (D.C.Cir.1973); *Note, State of Mind: The Elusive Exception*, 9 *U. of Cal., Davis L.Rev.* 199 (1976). The following references provide useful insight into the nature and scope of the exception. Hinton, *States of Mind and the Hearsay Rule*, 1 *U.Chi.L.Rev.* 394 (1934); Hutchins & Slesinger, *Some Observations on the Law of Evidence—State of Mind to Prove an Act*, 38 *Yale L.J.* 283 (1929); McBane, *Admissibility in California of Declarations of Physical or Mental Condition*, 19 *Calif.L.Rev.* 231 (1931); Maguire, *The Hillmon Case—Thirty-Three Years After*, 38 *Harv.L.Rev.* 709 (1925); Morgan, *Hearsay Dangers and the Application of the Hearsay Concept*, 62 *Harv.L. Rev.* 177 (1948); Payne, *The Hillmon Case—An Old Problem Revisited*, 41 *Va.L.Rev.* 1011 (1955); Rice, *The State of Mind Exception to the Hearsay Rule: A Response to " 'Secondary' Relevance,"* 14 *Duquesne L.Rev.* 219 (1975–76); Seidelson, *The State of Mind Exception to the Hearsay Rule*, 13 *Duquesne L.Rev.* 251 (1974); Seligman, *An Exception to the Hearsay Rule*, 26 *Harv.L.Rev.* 146 (1912); Slough, *"Res Gestae,"* 2 *Kan.L.Rev.* 121 (1953); Slough, *Spontaneous Statements and State of Mind*, 46 *Iowa L.Rev.* 224 (1961).

Colo.R.Evid. 803(3) defines the exception as follows:

"A statement of the declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

The Colorado Rules of Evidence became effective on January 1, 1980, and were not applicable to the trial of this case. Although Colo.R. Evid. 803(3) tracks the common law definition of the state of mind exception, it plays no part in our resolution of this case.

soned me." In rejecting the evidence as a state of mind assertion Justice Cardozo stated:

> "Declarations of intention, casting light upon the future, have been sharply distinguished from declarations of memory, pointing backwards to the past. There would be an end, or nearly that, to the rule against hearsay if the distinction were ignored.
>
> "The testimony now questioned faced backward and not forward. This, at least, it did in its most obvious implications. What is even more important, it spoke to a past act, and more than that, to an act by someone not the speaker. Other tendency, if it had any, was a filament too fine to be disentangled by a jury." 290 U.S. at 106, 54 S.Ct. at 26, 78 L.Ed. at 202–203.

One commentator succinctly put the matter this way:

> "If the courts should sanction the inference from the recollection of the unsworn observer to the reality of the thing remembered, they would practically abolish the hearsay rule altogether, because the most positive assertion of a past act or event, if really made on personal knowledge, amounts to a shorter way of saying, 'I remember that I perceived thus and so'. The state of mind called memory is thus proved by the statement of it.
>
> "The recollection proves the perception, which in turn proves the existence of the thing perceived." Hinton, *State of Mind and the Hearsay Rule*, 1 *U.Chi.L.Rev.* 394, 423 (1934).

 To be distinguished from state of mind assertions are out-of-court declarations admitted for the purpose of establishing the effect of the words on the mental or emotional state of the person hearing them. These declarations, not being hearsay, are admitted not to prove the truth of the words spoken but rather to establish the relevant state of mind in issue. *E.g., People v. Gladney*, 194 Colo. 68, 570 P.2d 231 (1977), *cert. denied* 434 U.S. 1038, 98 S.Ct. 776, 54 L.Ed.2d 787 (1968); *Bustamonte v. People*, 157 Colo. 146, 401 P.2d 597 (1965);

*People v. Burress*, 183 Colo. 146, 515 P.2d 460 (1973).

 Relevancy is a threshold standard which all evidentiary offerings, hearsay or otherwise, must meet. Evidence is relevant when it renders the claimed inference more probable than it would be without it. *See, e.g., People v. Calvaresi*, 198 Colo. 321, 600 P.2d 57 (1979). Relevant evidence, however, may be legally inadmissible when its probative value is outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury. *C. McCormick, supra*, § 185. While there are a number of situations in which a victim's fear of the defendant might be relevant in a homicide case, there are several clearly defined categories where it is directly in issue. The most common category involves a defendant's claim of self-defense. When evidence raises the issue whether the victim first attacked the defendant, evidence that the victim feared the defendant is highly probative of the declarant's future conduct, namely that the victim was not the aggressor. *See, e.g., People v. Gladney, supra; Bustamonte v. People, supra.* In such cases the relevant state of mind may be established by the victim's statement of fear or by the other evidence circumstantially probative of that condition. A second category is represented by those cases where the defendant claims suicide as the cause of death. *See Commonwealth v. DeValle*, 351 Mass. 489, 221 N.E.2d 922 (1966); Recent Cases, *Evidence—Admissibility of Declarations Evincing Intention or State of Mind Where Suicide is Asserted as a Defense to Homicides*, 28 *Temple L.Q.* 143 (1954). In such cases evidence of the victim's fear of the defendant tends to refute the defendant's evidence of a suicidal bent. A third category involves the defendant's claim of accidental death, for example an accidental shooting arising out of a struggle instigated by the victim. *E.g., People v. Lew*, 68 Cal.2d 774, 441 P.2d 942, 69 Cal.Rptr. 102 (1968); *People v. Finch*, 213 Cal.App.2d 752, 29 Cal.Rptr. 420 (1963). Here evidence of the victim's fear of the defendant tends to rebut a contention that the victim initiated

the confrontation. Where the victim's state of mind has not been directly placed in issue, some courts nevertheless admit the victim's statements of fear. on the theory that such evidence is circumstantially probative of identity, *e.g., State v. Gause*, 107 Ariz. 491, 489 P.2d 830 (1971), vacated on other grounds, 409 U.S. 815, 93 S.Ct. 192, 34 L.Ed.2d 71 (1972); *People v. Merkouris*, 52 Cal.2d 672, 344 P.2d 1 (1959), or is relevant to the issues of motive or intent, *e.g., Sallee v. State*, 544 P.2d 902 (Okl.Cr.1976).[14]

### B.

Within the framework of these general principles we turn to the challenged evidence. The prosecution offered the victim's assertions early in its case in chief under the state of mind exception. When the statements were offered and received there was no evidence suggesting the victim's death was a suicide. From the outset of the trial the prosecution's evidence established quite conclusively that death resulted from a criminal agency. The defendant never challenged the criminal character of the homicide by claiming suicide or accident. His defense was simply that he did not commit the murder. The purpose for which the victim's assertions were admitted—to prove the criminal character of the homicide—was never a contested issue in the case.

We recognize that although a victim's state of mind may not be directly in issue when evidence thereon is admitted in the first instance, it may become a material issue later in the case. In this case, however, neither the prosecution's evidence nor the defense evidence raised the issue of self-defense. Nor was there any evidence of a "serious and highly provoking act of the intended victim" that arguably could have implicated the victim's state of mind and reduced the crime to manslaughter. Section 18–3–104(1)(c), C.R.S.1973 (1978 Repl.Vol. 8). The case was submitted to the jury only on the charge of first degree murder after deliberation. Thus, the victim's state of mind was never directly placed in issue.

The People urge that even though the victim's state of mind was not itself directly placed in issue, the admission of the hearsay assertions should not be deemed error so long as relevant to any material issue in the case. There are situations where a victim's state of mind is not directly in issue but nevertheless state of mind assertions may be relevant to some other material issue in the case, such as identity.[15] However, in this case we need not determine what relevancy, if any, the victim's statements had upon other issues in the case. The hearsay assertion contained references to matters which went far beyond the scope of the state of mind exception, and whatever relevancy there might be to some portions of the assertions was far outweighed by the danger of jury misuse and resulting prejudice to the defendant stemming from other parts of the statements.

As previously noted a state of mind assertion consists of a description of the mental state of the declarant at the time of the statement. That the victim's assertions were admitted for the truth of their contents cannot be disputed. The jury was not cautioned to disregard the statements as evidence of the truth of the matters asserted therein. Indeed, considering the eviden-

---

**14.** The rule which admits evidence of a victim's statement of fear of the defendant as probative of identity or intent, without the victim's state of mind having been directly placed in issue, has been subject to some criticism. The criticism is that in such cases the victim's statement of fear is used indirectly to infer the defendant's past conduct (a threat or an assaultive act) from which his future conduct and state of mind are inferred. *See, e.g., United States v. Brown*, 490 F.2d 758, 771–72 (D.C.Cir. 1973); *Note, State of Mind: The Elusive Exception*, 9 *U.Calif. Davis L.Rev.* 199, 218–19 (1976).

**15.** For example, where the issue of identity is contested, a victim's statement of intent to go out with the defendant on the particular evening on which she was subsequently murdered would be circumstantial evidence that the victim did subsequently act in accordance with her previously expressed intention. *See, e.g., Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892); *United States v. Annunziato*, 293 F.2d 373 (2d Cir. 1961); C. McCormick, *Evidence*, § 295 (1972).

tiary context in which the statements were admitted, the victim's words by themselves had little, if any, significance other than the truth of their contents. The plain meaning of the court's limiting instruction was that the jury could consider the contents of the statements as proof of the decedent's state of mind in relation to the criminal character of the homicide.

An analysis of the victim's assertions discloses that any reference therein to the victim's state of fear is significantly overshadowed by references to other matters not encompassed by the state of mind exception. These improper references include assertions about the defendant's (as distinguished from the declarant's) state of mind, an opinion relating to the likelihood of his murdering the victim-declarant, and a reference to the defendant's past homicidal conduct. The victim's statements to Jessica Roberts and William Fleming indicating that the defendant was so mad he could kill her are assertions about the defendant's state of mind. Similarly, the victim's statements to Betty Fleming, William Fleming and Khip Turley about checking the trash cans if she (the victim) came up missing are nothing less than expressions of opinion that the defendant will kill her. The victim's Thanksgiving Day statement to her daughter, Khip Turley, basically was a repetition of the defendant's statement to the victim that he had killed before and would kill again, if necessary. It contains not the slightest reference to the declarant's state of mind.

We cannot ignore the practical and human limitations of the jury system. The hearsay assertions bluntly informed the jury that the defendant intended to kill the victim-declarant, that the victim was of the opinion he would likely do so, and that the defendant had killed in the past. The court's instruction permitted the jury to consider these assertions for their truth as they related to the victim-declarant's state of mind. Under this same instruction the jury could not avoid considering the same assertions for what they clearly depicted about the defendant—his intent to kill, the likelihood of his doing so, and his prior homicidal conduct.

Generally, in a trial on the merits a lay witness cannot testify directly to a defendant's criminal intent nor venture an opinion about a defendant's future criminality. *See, e.g., Bershenyi v. People*, 71 Colo. 432, 207 P. 591 (1922); 3 *Wharton's Criminal Evidence* § 623 (13th ed. C. Torcia 1973). The admission of the hearsay assertions in this case permitted the prosecution to do indirectly what it could not do directly. Such evidence, in addition to being substantively inadmissible, contravenes the basic requirements of admissibility for any hearsay assertion under the state of mind exception—a statement of the declarant's then existing state of mind. *See, e.g., United States v. Kaplan*, 510 F.2d 606 (2d Cir. 1974); *United States v. Brown*, 490 F.2d 758 (D.C.Cir.1973); *People v. Lew, supra; People v. Hamilton*, 55 Cal.2d 881, 362 P.2d 473, 13 Cal.Rptr. 649 (1961); *State v. Fowler*, 248 N.W.2d 511 (Iowa 1976), *cert. denied* 439 U.S. 1072, 99 S.Ct. 842, 59 L.Ed.2d 37 (1979); *People v. White*, 401 Mich. 482, 257 N.W.2d 912 (1977); *State v. Parr*, 93 Wash.2d 95, 606 P.2d 263 (1980).

Moreover, especially in a murder prosecution, a reference during the prosecution's case in chief to a defendant's prior act of homicide is extremely inflammatory and likely to beget prejudice in the minds of the jury. *See, e.g., Stull v. People*, 140 Colo. 278, 344 P.2d 455 (1959); *Martin v. People*, 114 Colo. 120, 162 P.2d 597 (1945); *Tarling v. People*, 69 Colo. 477, 194 P. 939 (1921). If anything, the likelihood of prejudice is compounded when the inadmissible evidence takes the form of an out-of-court declaration not subject to cross-examination. *See, e.g., People v. Botham*, Colo., 629 P.2d 589 (1981).

For the jurors in this case to consider the assertions as true only as they related to the victim's state of mind and not true for any other purpose is a feat beyond their "ability and almost certainly beyond their willingness." *C. McCormick, supra*, § 294 at 696. Justice Cardozo recognized the futility of such an expectation in *Shepard v. United States, supra* :

"It will not do to say that the jury might accept the declarations for any light that they cast upon the existence of a vital urge, and reject them to the extent that they charged the death to some one else. Discrimination so subtle is a feat beyond the compass of ordinary minds. The reverberating clang of those accusatory words would drown all weaker sounds. It is for ordinary minds, and not for psychoanalysts, that our rules of evidence are framed. They have their source very often in considerations of administrative convenience, of practical expediency, and not in rules of logic. When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out." 290 U.S. at 104, 54 S.Ct. at 25–26, 78 L.Ed. at 201–202.

Other courts have come to the same conclusion under circumstances similar to those present here. *See, e.g., People v. Ireland,* 70 Cal.2d 522, 450 P.2d 580, 75 Cal.Rptr. 188 (1969); *People v. Hamilton, supra; State v. Wauneka,* 560 P.2d 1377 (Utah 1977); *see also People v. White, supra.*

We conclude that the admission of the victim's assertions in their present form [16] irreparably impaired the fairness of the trial proceedings and constituted reversible error. We accordingly reverse the conviction and remand the case for a new trial.

### IV. *The Constitutionality of Crim.P. 41.1*

Since the issue of the admissibility of the defendant's handwriting exemplars is likely to be raised upon retrial, we elect to address his contention relating to Crim.P. 41.1. The defendant does not question the sufficiency of the affidavit upon which the nontestimonial identification order was issued. Rather, he argues that the rule is facially unconstitutional because it permits an investigatory detention on less than probable cause in contravention of the Fourth Amendment to the United States Constitution and Article II, Section 7, of the Colorado Constitution.

At the outset we put to rest the People's claim that the defendant was not seized and therefore lacks standing to challenge the rule. Crim.P. 41.1 requires the judge to issue "an order directed to any peace officer to take the person named in the affidavit *into custody* to obtain nontestimonial identification." (Emphasis added) Such an intrusion clearly is within the scope of the search and seizure clause of the Fourth Amendment and its Colorado counterpart and the defendant's constitutional interest in privacy has been adversely affected by the intrusion. *See, e.g., Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1969); *Stone v. People,* 174 Colo. 504, 485 P.2d 495 (1971). The critical question is whether the intrusion can be constitutionally justified.

Crim.P. 41.1 was an outgrowth of dicta in *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), suggesting that limited intrusions based on less than probable cause might be constitutionally permissible under narrowly defined circumstances. Subsequent cases of the United States Supreme Court have addressed the propriety of such intrusions in various contexts. *See, e.g., Michigan v. Summers,* —— U.S. ——, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981); *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio, supra.* These cases suggest that limited intrusions into privacy on less than probable cause are reconcilable with Fourth Amendment guarantees when the following conditions exist. First, there must be an articulable and specific basis in fact for suspecting criminal activity at the outset. Second, the intrusion must be limited in

---

16. Nothing short of trimming all references except the victim's statement of fear of the defendant could obviate the confusion and likely prejudice engendered by the admission of the entire statement in this case. We, of course, express no opinion on the relevancy of the victim's state of mind and leave that matter for the trial court to resolve in the evidentiary context of the new trial.

scope, purpose and duration. Third, the intrusion must be justified by substantial law enforcement interests. Last, there must be an opportunity at some point to subject the intrusion to the neutral and detached scrutiny of a judicial officer before the evidence obtained therefrom may be admitted in a criminal proceeding against the accused.

"The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard .... Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction." *Terry v. Ohio, supra*, 392 U.S. at 21–22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906.

▆▆▆ Judged by these standards we are satisfied that Crim.P. 41.1 passes constitutional scrutiny. Crim.P. 41.1(c)(1) and (2) require that an order for nontestimonial identification evidence be supported by articulable and specific facts in the form of an affidavit establishing: (1) probable cause to believe a crime has been committed; and (2) reasonable grounds, not amounting to probable cause to arrest, to suspect the person described in the affidavit committed the offense. The rule is limited to nontestimonial identification evidence only and does not authorize the acquisition of testimonial communications protected by the privilege against self-incrimination. *See Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Crim.P. 41.1(h)(2) provides:

" 'Nontestimonial identification' includes, but is not limited to, identification by fingerprints, palm prints, footprints, measurements, blood specimens, urine specimens, saliva samples, hair samples, specimens of material under fingernails, or other reasonable physical or medical examination, handwriting exemplars, voice samples, photographs, appearing in lineups, and trying on articles of clothing."

The order itself must designate the specific identification procedure to be conducted, Crim.P. 41(e), and upon completion the person must be released or charged with an offense, Crim.P. 41(d). Also, Crim.P. 41(c)(3) requires that before issuance of any order the judge be satisfied, by affidavit, that the results of the identification procedures will be of material aid in determining whether the person committed the offense. In this respect the rule insures, to the extent practicable, that the requested procedures be demonstrably related to the apprehension of a suspected offender for a specific crime, certainly a substantial law enforcement interest. Finally, the rule requires prior judicial approval for the order and imposes conditions of execution calculated to adequately safeguard the constitutional interests of the person affected. Not only must the judge direct that the designated procedure be conducted expeditiously, Crim.P. 41.1(d), but also Crim.P. 41.1(f) further provides that:

"(1) No person who appears under an order of appearance issued pursuant to this section (f) shall be detained longer than is reasonably necessary to conduct the specified nontestimonial identification procedures unless he is arrested for an offense.

"(2) The order may be executed and returned only within ten days after its date.

"(3) The order shall be executed in the daytime unless the issuing judge shall endorse thereupon that it may be served at any time, because it appears that the suspect may flee the jurisdiction if the order is not served forthwith.

"(4) The officer executing the order shall give a copy of the order to the person upon which it is served.

"(5) No search of the person who is to give nontestimonial identification may be

made, except a protective search for weapons, unless a separate search warrant has been issued.

"(6) A return shall be made to the issuing judge showing whether the person named has been:

"(I) Detained for such nontestimonial identification;

"(II) Released or arrested.

"(7) If, at the time of such return, probable cause does not exist to believe that such person has committed the offense named in the affidavit or any other offense, the person named in the affidavit shall be entitled to move that the judge issue an order directing that the products of the nontestimonial identification procedures, and all copies thereof, be destroyed. Such motion shall, except for good cause shown, be granted."

Our evaluation of Crim.P. 41.1 leads us to conclude that it does not violate either the Fourth Amendment to the United States Constitution or Article II, Section 7, of the Colorado Constitution. *See State v. Grijalva*, 111 Ariz. 476, 533 P.2d 533 (1975); *In re Fingerprinting of M.B.*, 125 N.J.Super. 115, 309 A.2d 3 (1973). We therefore reject the defendant's claim of facial unconstitutionality.

V. *Other Suppression Issues*

The defendant claims that he was unconstitutionally arrested or detained on December 26, 1977, and any evidence directly re-

sulting therefrom—such as his statements to the police, his consent to examination of the shoes, and the chemical tests performed on the shoes—was constitutionally inadmissible under the derivative evidence rule. Although these issues were raised in the course of the suppression hearing, the trial court resolved the motion to suppress on grounds unrelated to the "fruit of the poison tree" doctrine.[17] In the absence of findings of fact essential to a proper resolution of these claims, we decline to address them at this time.

 However, since the case is being remanded for a new trial, we direct the trial court to address these issues under appropriate constitutional standards. If the defendant was not subjected to an unlawful detention on December 26, then the derivative evidence rule would not be applicable. If, however, the court finds the defendant was subjected to an unconstitutional arrest or detention, any evidence resulting from the exploitation of the initial illegality would be suppressible, *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), unless the prosecution can establish an independent source for the evidence, *e.g., People v. Founds*, Colo., 621 P.2d 325 (1981), or a sufficient attenuation from the initial illegality. *People v. Lowe*, Colo., 616 P.2d 118 (1980).[18] The *Miranda* warnings, by themselves, are not sufficient to dissipate the taint of a Fourth Amend-

---

17. The court denied the motion to suppress the statements because it found that the defendant knowingly, intentionally and voluntarily waived his *Miranda* rights and freely entered into discussions with the police. The court granted the motion to suppress the shoes on the sole basis that the defendant had not consented to their retention by the police. After this court reversed the suppression order in an interlocutory appeal, *People v. Madson*, 196 Colo. 507, 586 P.2d 1338 (1978), the issues relating to the application of the derivative evidence rule to the challenged evidence were never renewed by the defendant's then trial attorney. At the conclusion of the trial the court permitted the defendant's original attorney to withdraw and appointed the Public Defender's Office which raised these matters in a motion for a new trial.

18. If in this case the identity or location of a witness was obtained as the result of an unconstitutional search or seizure, or as the result of an illegal interrogation in violation of *Miranda*, the "inevitable discovery" rule also might be applicable to the suppression hearing. Under this rule the witness will be permitted to testify at trial if the prosecution can establish that, in spite of the constitutional violation, the police inevitably would have discovered the witness' identity or location in the course of normal police investigation. *See People v. Lee*, Colo., 630 P.2d 583 (1981). It does not appear from the record that the witnesses were identified or located as the result of the allegedly illegal detention or arrest and/or the ensuing interrogation but we leave the matter for the trial court's decision in the event the issue is raised on remand.

ment violation even though the statements be otherwise voluntary in the constitutional sense. *E.g., Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *McCall v. People*, Colo., 623 P.2d 397 (1981). Nor does a voluntary consent to search necessarily insulate the evidence obtained thereunder from the application of derivative evidence principles. *See, e.g., Wong Sun v. United States, supra; People v. Lowe, supra.* In resolving these issues the trial court on remand may permit the parties to present additional evidence and argument.

The judgment is reversed and the cause is remanded for a new trial in accordance with the views expressed herein.