**JOHNSON**

**v.**

**BALTIMORE & O. R. CO.**

**No. 11118.**

United States Court of Appeals
Third Circuit.

Argued Nov. 20, 1953.

Decided Dec. 18, 1953.

Rehearing Denied Jan. 25, 1954.

See, also, D.C., 106 F.Supp. 166.

Marvin D. Power, Pittsburgh, Pa. (Margiotti & Casey, Pittsburgh, Pa., on the brief), for appellant.

P. J. McArdle, Pittsburgh, Pa. (James P. McArdle, Pittsburgh, Pa., on the brief), for appellee.

Before GOODRICH, McLAUGHLIN and KALODNER, Circuit Judges.

GOODRICH, Circuit Judge.

This is an action brought by the administratrix of a decedent under the Pennsylvania Fiduciaries Act of 1917 [1] to recover damages for an alleged wrongful death. The acts complained of, the injury and the death all occurred in Pennsylvania. The only basis for federal jurisdiction is diversity and the substantive law rules which govern are those of Pennsylvania. It may be said at the outset that the case presents no problem with regard to substantive rules of tort law. The plaintiff won in the district court and defendant appeals.

The factual background is one of bizarre and unusual circumstances. The decedent was a man named George Johnson, age approximately 35. That he was shot and killed by a railroad policeman named Clyde Hall is clear from all the testimony and not denied by the defendant. The defense is that Hall was work-

---

1. Pa.Stat.Ann. tit. 20, § 772, ch. 3 Appendix; now supplanted by the Act of 1949, Pa.Stat.Ann. tit. 20, §§ 320.101, 320.603.

**634**

ing in the course of his duty as a railroad policeman, had a reasonable belief that Johnson had committed the felony of "angle-cocking"[2] and while attempting to take him into custody was forced to shoot Johnson to save his own life. Hall's story was that as he attempted to put handcuffs on Johnson he received a blow in the face from the latter which knocked him down and temporarily dazed him. As Hall recovered consciousness, he says, he was aware that Johnson was astride his thighs brandishing a knife with apparent intent to deal a fatal blow. Testimony from several witnesses, in addition to Hall, corroborated the fact that Hall was, on the occasion in question, rather badly cut up.

As above stated the case did seem to present a fairly simple fact question: Did Hall kill Johnson in the reasonable belief that such killing was necessary to save his own life? If he did, the killing was justified and there is no civil or criminal liability involved. See Restatement, Torts § 65 (1934).

The description of the brief but tragic encounter came from the testimony of Hall. The other participant, Johnson, died within a short time after the affray. There were other witnesses on subordinate points. The trier of the facts did not believe Hall's story. The main question in the case is whether there is some rule of law which says his story must stand for the purpose of this litigation as a true account of the transaction whether the jury believed it or not.

To the above statement it should be added that Hall was called as a witness by the plaintiff upon the judge's suggestion that up to the time he was called there was not a sufficient case made out

on which the plaintiff could recover. We agree with the trial judge on that. Without Hall's story or part of it there was not a sufficiently clear outline of the facts and circumstances to give a jury anything to pass upon.

The plaintiff having called Hall, is he necessarily bound by everything Hall said? We could probably dispose of this case and be technically sound in doing so by saying that, whatever the rule may be with regard to the question framed, the defendant has lost his chance to raise the point. After the testimony was closed, counsel for the defense made a motion for directed verdict. The court asked him if he had the authorities he was going to give the court "that the plaintiff is bound by the testimony of Hall whom he called as his witness." Counsel apologized for not having been able to look up the authorities, due to the press of other business, and after a short colloquy with the court said: "I will say that I abandon my position in that regard, because I don't have what your Honor asked me to get." If counsel had, in the pressing business of trying a case and having to look after other matters at the same time, inadvertently conceded the determining point of law, we should hesitate to hold him to that concession. But here we do not think that he gave away anything by abandoning the point he had raised.

During the argument Rule 43(b) Fed.R.Civ.P., 28 U.S.C., was talked about. That rule permits a party to interrogate an unwilling or hostile witness by leading questions and it makes provision for calling an adverse party for something comparable to cross-examination.[3]

**2.** "Angle-cocking" is the illegal halting of a train by application of an air valve. See Pa.Stat.Ann. tit. 18, § 4919.

**3.** "A party may interrogate any unwilling or hostile witness by leading questions. A party may call an adverse party or an officer, director, or managing agent of a public or private corporation or of a partnership or association which is an

adverse party, and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party, and the witness thus called may be contradicted and impeached by or on behalf of the adverse party also, and may be cross-examined by the adverse party only upon the subject matter of his examination in chief." Fed.R.Civ.P. 43(b).

That rule is not in this case. The plaintiff did not call Hall as an adverse party or an unwilling witness. We are not saying that he would be compelled to designate him by that label if he wanted to take advantage of Rule 43 (b). The point is that counsel for the plaintiff simply called Hall as a witness and asked him questions in the same way as he did the other witnesses. He asked for no special privileges with regard to the examination. We think, therefore, that Rule 43(b) has nothing to do with this case.

Then there is the further question whether, when one calls a witness, everything which that witness says, so far as the party calling him is concerned, must be taken as gospel truth. This point was discussed in Moran v. Pittsburgh-Des Moines Steel Co., 3 Cir., 1950, 183 F.2d 467. But in that case we were not called upon to repudiate the old rule that a party is bound by the testimony of his witness. When witnesses were called by a party from among his friends to act as compurgators it was completely rational that the party calling them would have to stand by what they said. After all he chose his friends. But when witnesses are called, in some stranger's lawsuit, to tell about things they saw, heard, or did, there is no reason in logic or common sense or fairness why the party who calls them should have to vouch for everything they say. All this has been said vigorously and strikingly by Dean Wigmore, who stated: "There is no substantial reason for preserving this rule,—the remnant of a primitive notion." It is only necessary to cite Wigmore for full discussion of the matter.[4]

All the modern writers in the law of evidence speak to the same effect. Thus, Edmund M. Morgan, in a forthcoming book,[5] says:

"The fact is that the general prohibition, if it ever had any basis in reason, has no place in any rational system of investigation in modern society. And all attempts to modify it or qualify it so as to reach sensible results serve only to demonstrate its irrationality and to increase the uncertainties of litigation."

John M. Maguire also has attacked the rule:

"According to the best professional thought, sweeping prohibition of impeachment by a party of his own witnesses is nonsense—most regretably not simple nonsense, but very complex nonsense. * * *"[6]

Likewise, see John E. Tracy: "The reasons given for this rule * * * are none of them very sound."[7] In an exhaustive article, Mason Ladd advocates "complete abolition of the rule" and proposes as a statutory substitute: "No party shall be precluded from impeaching a witness because the witness is his own."[8] Finally, the Model Code of Evidence framed by the American Law Institute abolishes the prohibition: "* * for the purpose of impairing or supporting the credibility of a witness, any party including the party calling him may examine him and introduce extrinsic evidence concerning any conduct by him and any other matter relevant upon the issue of his credibility as a witness. * * *"[9]

Nothing could make the rule look more foolish than its application in a case like this. Only two people were present when this affray occurred and one of them died immediately after. The employer of the survivor is being sued.

4. 3 Wigmore on Evidence 383, 389 (3d ed. 1940).

5. Morgan, Basic Problems of Evidence (to be published by the Committee on Continuing Legal Education of the American Law Institute).

6. Maguire, Evidence—Common Sense and Common Law 43 (1947).

7. Tracy, Handbook of the Law of Evidence 193 (1952).

8. Ladd, Impeachment of One's Own Witness—New Developments, 4 U. of Chi.L. Rev. 69, 96 (1936).

9. Model Code of Evidence, Rule 106 (1942).

What could be more human than that Hall would make his story show the propriety of his own conduct and the wrongfulness of that of his opponent in the fight. And what would be sillier than to insist that the jury is compelled to believe all that testimony which the witness offered in explanation of an intentional killing on his part?

There were some points at which the witness, Hall, could well not have been believed. His identification of Johnson at night, seen through the opening between two cars of a freight train, is one. A quick shifting of a gun from left to right hand in the course of exchange of blows that could have lasted but a few seconds is another. But most of all is the background of the interest of this witness in establishing an impression favorable to himself.

The judge, in a very thorough charge, left the critical questions in the case clearly to the jury. They must have known just exactly what they were doing, as well as one can tell from seeing the way the case was left to them. The trial judge said that he would not have come to the conclusion which the jury did. Perhaps we would not either, were we to judge the facts. But this case has been submitted to two juries. (A third jury passed on the question of damages only.) One disagreed; the other brought in a verdict for the plaintiff. Trial by jury is no litmus test for finding what is true or false but it is the system which we have. Twelve responsible citizens, under oath sworn to give their verdict on the law and evidence, have decided the fact issues. The judge has put the law accurately to them. Whether he or we agree with their conclusion is not the determining factor.

The first award of damages was $10,000. The second was $16,000. The trial judge pointed out that each award was higher than he would have made. But he added that it was not so large as to shock his conscience and, therefore, he would not disturb it. We do not do so either. The authority of a federal appellate court with regard to an award of damages is pretty much limited. Zarek v. Fredericks, 3 Cir., 1943, 138 F.2d 689; Dubrock v. Interstate Motor Freight System, 3 Cir., 143 F.2d 304, certiorari denied 1944, 323 U.S. 765, 65 S.Ct. 119, 89 L.Ed. 613.

The judgment of the district court will be affirmed.