Caroline O'SHEA, Plaintiff-Appellee,

v.

JEWEL TEA CO., Inc., Defendant-Appellant.

No. 11511.

United States Court of Appeals Seventh Circuit.

May 21, 1956.

Alvin G. Hubbard, Reese Hubbard, Chicago, Ill., Hubbard, Hubbard & Dorgan, Chicago, Ill., of counsel, for appellant.

Gerald M. Chapman, Philip H. Corboy, Chicago, Ill., for appellee.

Before LINDLEY, SWAIM and SCHNACKENBERG, Circuit Judges.

SWAIM, Circuit Judge.

The plaintiff, Caroline O'Shea, brought this action for damages for injuries to her foot which were caused by a canned ham falling from a glider and striking her foot while she was shopping in one of the defendant's stores in Chicago.

The glider in question was one of the conventional type of four-wheeled shopping carts ordinarily supplied by self-service food markets as a convenience to their customers while shopping. These gliders are so constructed that when they are not in use they can be stored together by pushing the basket of each glider into the one in front of it, thus saving space in the market. To accomplish this the back side or gate of each of the baskets is hinged at the top of the basket frame so that when another basket is pushed into it, the back side of the front basket swings in and up. To prevent the back gate of the basket from swinging backward and out of the basket there are, at the lower end of the gate, eight flanges, each one inch wide and each formed by two right angle bends in the wire, which serve as two longitudinal bars of the gate. When the gate is closed the flanges rest against the bar at the back end of the basket.

The complaint charged that plaintiff's injuries were directly and proximately caused by the negligence of the defendant in furnishing the plaintiff a cart which the defendant knew, or in the exercise of ordinary care should have known, was in a defective and dangerous condition.

There was evidence that when the plaintiff started to use the glider the gate which formed the back of the basket was in its proper position inside the basket, that plaintiff placed a canned ham in the glider basket with the broader part of the can toward the back of the basket, that at that time the tailgate of the basket was still inside, and that the plaintiff then went to other parts of the market where she picked up and put into the basket two quarts of milk and a bag of potatoes. Plaintiff said that as she was walking down one of the aisles

in the store and looking at the things on the shelves, she felt a thud, and looking down saw the canned ham on her foot and on the floor. Plaintiff said she then looked at the gate of the basket and saw that it was open.

The plaintiff's husband testified that after the accident he went into the store, examined the basket and found that he could push the gate in and out and that "it just barely caught on the bottom." He said that the flanges on the lower end of the gate were bent so that they did not hold the gate inside of the basket if there was pressure from the inside.

In its first proposition of law in its brief in this court the defendant contends that under the facts of this case the plaintiff was guilty of contributory negligence, and makes the following positive statement: "Plaintiff never looked at the tailgate to see whether it was closed." It is true that the plaintiff said that she did not "examine" the gate at the rear of the basket, but the record discloses that in answer to questions as to whether she looked at it prior to the accident, plaintiff gave six affirmative answers which the jury had a right to, and apparently did, believe.

■■ The testimony of the plaintiff that prior to the accident she looked and saw that the gate of the basket was inside of the basket and that she saw nothing wrong with the basket furnished a basis for a finding by the jury that the plaintiff was not guilty of contributory negligence. Certainly it is not required that each customer using a basket must physically test it to see that the gate is firmly held in place.

The defendant insists that the trial court committed prejudicial error in striking out certain testimony given by the plaintiff on cross-examination and all of the testimony of Dr. Plice, who had been the plaintiff's family physician all of her life prior to 1951, and in refusing to admit in evidence what was purported to be Dr. Plice's official record pertaining to his treatment of the plaintiff prior to 1951.

The testimony which was stricken was stricken on the motion of plaintiff's attorney " * * * that all of the testimony of cross-examination of the Plaintiff in this case, Mrs. Caroline O'Shea, with reference to a previous accident and treatment by Dr. Plice be stricken from the record, and the jury instructed to disregard it." This same motion also asked that the testimony attempted to be elicited from Dr. Plice by counsel for the defendant be stricken.

■ The plaintiff throughout had repeatedly insisted both on direct examination and on cross-examination that she had never had anything wrong with her right foot, the one claimed to have been injured on August 29, 1952, in the store of the defendant. The defendant was apparently of the opinion that the plaintiff had suffered a prior injury to her right foot and that the prior injury had been treated by Dr. Plice who had been her regular physician prior to his retirement in 1951. The plaintiff had failed to mention the name of Dr. Plice when she was asked to name all the doctors who had ever treated her. Counsel for the defendant should have been given wide latitude in cross-examining the plaintiff in his attempt to show a prior injury and the treatment of that injury by Dr. Plice. If such an accident, injury and treatment by Dr. Plice had been shown it not only would have seriously reflected on the plaintiff's veracity but it might also have tended to show that the present condition of plaintiff's right foot was partially or wholly due to the injury suffered in the prior accident. The striking of this testimony of the plaintiff clearly constituted prejudicial error.

■ The defendant also complains of the fact that the trial court refused to permit it to introduce Defendant's Exhibit 14 into evidence. That exhibit purported to be Dr. Plice's office record of his treatment of the plaintiff. Dr. Plice testified that the record had been in his possession since the time it was made; that the items on it were, as far as he knew, true and correct; that they were written on the dates set opposite

each item contained therein; and that all of the entries on the record were in his handwriting. Counsel for the plaintiff objected that the witness had not looked at the card. The court then directed Dr. Plice to look at the card and the witness said that he couldn't see it—that he was blind. The court thereupon sustained the objection to the admission of the exhibit. At that point counsel for the defendant offered no further proof to identify the exhibit, although later in colloquy between the court and the attorneys, outside the presence of the jury, defense counsel, in attempting to show that Dr. Plice was not totally blind, stated that he had a witness who was prepared to testify that when the doctor was subpoenaed he went into the back room with his wife and when they came out with two cards she asked the doctor which one, and the doctor held them up close and selected the card which he brought in. If counsel for the defendant had witnesses to prove such facts he should have, in fairness to the trial court, introduced their testimony as part of his defense. If, as the doctor testified, he was so blind that he could not see his official record, he necessarily was basing his testimony that it was the record of his treatment of the plaintiff on what his wife or some one else had told him. However, in view of the doctor's undisputed testimony, we think his record was admissible under the broad provisions of the Federal Business Records Act, 28 U.S.C.A. § 1732, which is expressly made applicable to the records of professional men. That Act provides that:

"In any court of the United States * * * any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

"All other circumstances of the making of such * * * record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility."

The most troublesome question in this case arises from the action of the trial court in striking out the entire testimony of Dr. Plice, on the motion of plaintiff's counsel. Counsel for the defendant was attempting to show by the doctor's testimony that he had, contrary to plaintiff's testimony, treated the plaintiff for an injury to her right leg suffered in a prior accident in another store. Dr. Plice testified that he had known the plaintiff all of her life and that prior to his retirement in 1951 he had treated her for various ailments. The doctor was then asked if he, approximately five or six years before the trial, had treated the plaintiff for an injury to her right leg. The doctor answered: "I don't really know whether I did or not. I can't remember." The doctor testified further that at one time the plaintiff had capillary fragility in one of her legs but that he did not remember which leg it was. The doctor also said: "I think she had—well, that is, I can't tell you definitely because I can't remember positively just what happened. My impression was that she had arthritis, a mild form of arthritis, and cystitis at various times. She would recover from one thing and then get something else." Defense counsel then further interrogated the witness as follows:

"Q. Now, Doctor, have you told us everything now you can remember? A. Well, about what?

"Q. About any injury or any treatment to Caroline O'Shea which you did? A. I remember she had an accident in a store. Now which store it was, I don't know. Where it was I don't know, nor I don't remember the date; nor what the in-

jury was, nor what I did for it. I don't remember that. I have a recollection that she was injured but what it was and what I did for it I don't know."

Following that statement the court said: "Well, upon that statement we will just close that chapter right there." The court then refused the request of defense counsel to attempt to "refresh" the recollection of the witness.

We assume that at that point in the examination of this retired, blind doctor, who was eighty-four years of age, the trial court came to the conclusion that the witness was mentally incompetent to testify and, therefore, struck out all of the testimony which the witness had given. While the credibility of a witness presents a question for the jury, his competency to testify is a question which the trial court must determine, and in reviewing that determination we can look only for an abuse of discretion. Henderson v. United States, 6 Cir., 218 F.2d 14; Jones on Evidence, Volume 3, § 719 (4th ed., 1938); Wigmore on Evidence, Volume 2, § 487 (3d ed., 1940).

Jones on Evidence, supra, § 719, states:

"Doubtless, the liberty or property rights of the citizen should not depend upon the testimony of those who are so wanting in understanding that they cannot remember or cannot form any conception of right and wrong * * *. * * * Regardless of the nature or cause of mental disability, the test of competency to testify is as to whether the individual has sufficient understanding to appreciate the nature and obligation of an oath and sufficient capacity to observe and describe correctly the facts in regard to which he is called to testify. If the witness is lacking in these qualifications it is an abuse of discretion for the court to permit him to testify."

Despite the fact that there were many things that Dr. Plice could not remember, he stated affirmatively that he did remember some things. He testified that Mrs. O'Shea had suffered from anemia, mucous colitis, varicose veins, and frequent colds. He also testified, as we have mentioned, that he knew she had an accident in a store but that he could not remember what he did for her at that time. The fact that the witness was old and admitted that there were many things he could not remember did not furnish sufficient grounds for finding him incompetent to testify as to those things that he could remember. When a witness takes the stand, he is presumed to be competent until shown to be otherwise. Stephan v. United States, 6 Cir., 133 F.2d 87, 95. There was nothing in this record sufficient to support the trial judge's decision that Dr. Plice was incompetent to testify as to those things that he said he could remember. On the record before us, striking the doctor's testimony and instructing the jury to disregard it was an abuse of discretion. It was prejudicial because the doctor had testified that he remembered that Mrs. O'Shea had had a prior accident in a store. If allowed to stand this would have tended to cast doubt on the truth of Mrs. O'Shea's testimony that Dr. Plice had never treated her for a prior injury. The doctor's testimony would, therefore, have gone to the plaintiff's credibility.

The defendant questions the action of the trial court in having permitted the plaintiff to question Verbal Carlson as an adverse witness under Rule 43(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. Carlson at the time of the accident was the manager of the defendant's store where the accident occurred and the plaintiff called him as an adverse witness under Rule 43(b). Prior to the trial of this case Carlson left the service of the defendant and at once started working for another company. He therefore technically could not be called and questioned as an "adverse witness" under Rule 43(b). Carlson, however, indicated that he still considered himself a member of the defend-

ant's camp by the fact that after being subpoenaed by plaintiff as a witness he went to the office of defendant's counsel for a conference prior to appearing at the trial. Carlson indicated his allegiance to the defendant still more by his testimony in the trial as to the condition of the glider basket in question. At the trial he contradicted statements he had made prior to the trial to an investigator for the plaintiff that the basket in question was defective and that he had taken it out of service and put it in the back room for repairs. During the trial Carlson also gave answers which were contradictory to his pretrial statement as to the inspection of the baskets by the defendant and as to whether the weight in the basket pushed out the gate of the basket. By these answers Carlson proved that he was a witness hostile to the plaintiff's action. Counsel for the plaintiff had a right to expect that the testimony of the witness Carlson would correspond to the statements he had made before the trial. The plaintiff was surprised by this adverse testimony of Carlson. Under such circumstances the old doctrine that a party is bound by and may not impeach the testimony of his own witnesses is no longer accepted in federal courts. Johnson v. Baltimore & Ohio R. Co., 3 Cir., 208 F.2d 633. In a case such as this a party should be able to impeach his own as well as his opponent's witnesses. Wigmore on Evidence, Volume 3, § 896 et seq. (3d ed., 1940).

The statements by the trial judge which the defendant complains of were, in our view entirely justified by the actions of defense counsel and the court's appraisal of the testimony of the doctor.

For the reasons discussed above, the judgment is reversed and the cause remanded for a new trial.

SCHNACKENBERG, Circuit Judge.

I concur in the foregoing opinion, but I am not in accord with all that is said therein in reference to the witness Carlson.