The PEOPLE of the State of Colorado, Plaintiff-Appellee,

v.

Paul Louis FIELDS, Defendant-Appellant.

No. 82CA0628.

Colorado Court of Appeals, Div. II.

Aug. 9, 1984.

Rehearing Denied Sept. 13, 1984.

Certiorari Granted March 11, 1985.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Maureen Phelan, Asst. Atty. Gen., Denver, for plaintiff-appellee.

Mary G. Allen, Denver, for defendant-appellant.

BERMAN, Judge.

Defendant, Paul Louis Fields, appeals his convictions by a jury of one count of first degree murder in the shooting death of Douglas Clunie and two counts of attempted first degree murder in the shooting and attempted shooting of Jay Davis and Anthony Butera, respectively. We affirm.

In August 1980 the defendant, a former deputy sheriff in Denver, began to work as a security guard at a K-Mart Store in Arapahoe County. The defendant worked with Jay Davis, the director of security for the store. Their immediate supervisor was Doug Clunie. The manager of the store was Anthony Butera.

Butera had decided to terminate defendant's employment because of an alleged incident of lying by the defendant. On the afternoon of March 19, 1981, the defendant arrived at work and was told that Butera wanted to talk with him in his office. Butera, who was fearful of how defendant might react to his termination, made final preparations for his confrontation with defendant by clearing his desk of various items which might be usable as weapons and by sending Clunie to locate Davis so that Davis could join Butera and Clunie in the meeting with defendant.

Butera and defendant sat alone for several minutes until Clunie returned with Davis. After all four men were seated, Butera informed defendant that he was terminating him and explained the reasons for the termination.

The defendant responded by stating that the termination was part of a "conspiracy to get rid of him and all other Blacks" and that "this was just round one with round two coming up." Davis then commented, additionally, that he could not tolerate defendant's "advances" to some of the female employees in the store, to which defendant stood up and responded with more charges of a "conspiracy to get rid of me" and with this statement: "The last [person] that tried to screw me over was in a bad way now." Clunie remained silent during the entire meeting.

Defendant then verbally threatened the lives of both Davis and Clunie and, turning to Butera, stated, "I have no beef with this man." At that point, defendant turned again toward Davis, pulled a gun, and shot Davis in the head at a range of six to twelve inches. Defendant then immediately turned, aimed his gun, and fired three times at Clunie. Butera dropped behind his desk, and almost simultaneously, the defendant fired two shots in Butera's direction, both of which missed.

Clunie died of an acute loss of blood from gunshot wounds which perforated both lungs, the heart, and the aorta. Davis was in a coma for six months, suffered some brain damage, and was blinded from the gunshot wounds he received. Butera was uninjured.

Defendant's theory of defense was self-defense. Defendant claimed that he thought Davis reached for his gun and that he believed he was going to be killed unless he acted first. However, Davis testified that he never carried a handgun and did not even own one. Furthermore, none of the three victims were found to have been armed and the overwhelming weight of the evidence shows that none had made any threatening or furtive gestures prior to being shot.

Defendant was convicted and sentenced to a term of life on the first degree murder charge and two concurrent terms of 12 years on the two attempted first degree murder charges. This appeal followed.

I.

Defendant's first contention is that the trial court erred in denying his motion to

dismiss based upon the alleged violation of defendant's statutory speedy trial rights under § 16–4–103, C.R.S. (1983 Cum.Supp.) and that, if this court holds that § 16–4–107, C.R.S. (1978 Repl.Vol. 8) is applicable instead, the latter statute is constitutionally infirm. We perceive no error in the trial court's denial of defendant's motion and no infirmity in the statute at issue.

## A.

On May 11, 1981, defendant's bail was set at $250,000 and, on June 24, 1981, bail was reduced to $60,000 on defendant's motion. On August 18, 1981, defendant's wife visited the defendant in jail, where defendant informed her that he was angry, that he was going to make bail that day, and that he was going to "take care of" her. Mrs. Fields interpreted this as a threat upon her life. Defendant also threatened a police officer who was a potential witness for the People.

Mrs. Fields immediately notified the Denver police of defendant's threat against her, and the police notified the trial court. Also on August 18, 1981, the court reinstated the original $250,000 bond and set the matter for a hearing on the following morning. The court made it clear that the $60,000 bond would be immediately reinstated unless the district attorney presented sufficient evidence to justify a bond increase.

The following morning, August 19, the prosecution filed a verified copy of Mrs. Fields' statement concerning defendant's threatened breaches of the condition of his bond, as required by § 16–4–107, C.R.S. (1978 Repl.Vol. 8). The court then granted defendant's request for a one week continuance in order to prepare for the bond hearing and ordered that the defendant be held pursuant to a warrant issued under § 16–4–107, C.R.S. (1978 Repl.Vol. 8).

On August 21, 1981, the district attorney filed a motion pursuant to § 16–4–107, C.R.S. (1978 Repl.Vol. 8) to increase defendant's bond to $250,000. On August 26, the hearing on defendant's bond increase was held and evidence of defendant's

threats against his wife and against the potential police witness was offered. At the conclusion of the evidence and arguments, the trial court increased defendant's bond to $100,000. The stated basis for this bond increase was the dissipation of defendant's family support, since June, to assist defendant in coming to court.

On November 24, 1981, defendant unsuccessfully moved to dismiss the charges against him, arguing that the bond increase had been ordered pursuant to § 16–4–103(2), C.R.S. (1983 Cum.Supp.) and that, therefore, trial in the matter was required within 90 days from August 18, 1981. Trial did not commence until December 7, 1981.

■ Under the express language of § 16–4–103(2), a bond may be increased "pursuant to this section" only if there has been a judicial finding that the "defendant has committed a class 1, 2, 3, or 4 felony while released pending adjudication of a prior felony charge." Here, there was no such finding by any court and, thus, the bond could not have been increased pursuant to § 16–4–103(2), C.R.S. (1983 Cum. Supp.). Therefore, the ninety-day requirement of that statute is inapplicable to defendant's case.

■ The only other statute applicable to the bond increase issue herein is § 16–4–107, C.R.S. (1978 Repl.Vol. 8). That statute, unlike § 16–4–103, C.R.S. (1983 Cum. Supp.), does not require defendant to be tried within ninety days of his bond increase. Therefore, the trial court did not err in denying defendant's motion to dismiss for failure to try defendant within ninety days of the court's order to increase bond.

## B.

■ Defendant argues, in the alternative, that § 16–4–107, C.R.S. (1978 Repl. Vol. 8) is violative of equal protection and, thus, unconstitutional. Ordinarily, we are without jurisdiction to address such questions as the facial constitutionality of a statute. *See* § 13–4–102(1)(b), C.R.S.

However, on June 7, 1983, in response to a proposed transfer of jurisdiction because of this issue, our Supreme Court "Ordered that jurisdiction shall be retained by the Court of Appeals." Accordingly, we have jurisdiction to address the issue of the statute's constitutionality. *See People v. Wieder,* 693 P.2d 1006 (Colo.App.1984); *Fisher v. Jorgensen,* 674 P.2d 1003 (Colo. App.1983).

■ The first step in any equal protection analysis is to determine the standard to be used in assessing the validity of the challenged legislation. Since the right to be tried within ninety days of a bond increase is not a "fundamental right," *see People v. Curtis,* 681 P.2d 504 (Colo.1984), and since the class of pretrial detainees is not a suspect class, the rational basis test must be applied. *See Claimants in re Death of Kohler v. Industrial Commission,* 671 P.2d 1002 (Colo.App.1983).

■ Under the rational basis test, the state need only show that the challenged provision is rationally related to a legitimate state interest. *Bellendir v. Kezer,* 648 P.2d 645 (Colo.1982). Thus, classes may be treated differently, so long as this unequal treatment is based on reasonable differences. *Bushnell v. Sapp,* 194 Colo. 273, 571 P.2d 1100 (1977).

■ Having established the appropriate test under which the statute at issue is to be examined, the second step is to set forth the appropriate standard of proof required by constitutional analysis. It is a fundamental principle that every statute is presumed constitutional unless proven to be invalid beyond a reasonable doubt. *Turner v. Lyon,* 189 Colo. 234, 539 P.2d 1241 (1975). More specifically, under a rational-basis-equal-protection analysis, the statute at issue may be invalidated only if no set of facts can reasonably be conceived to justify it. *Millis v. Board of County Commissioners,* 626 P.2d 652 (Colo.1981).

■ Here, it is permissible for the two classes of detainees under § 16–4–103, C.R.S. (1983 Cum.Supp.) and § 16–4–107, C.R.S. (1978 Repl.Vol. 8), respectively, to be treated differently because their unequal treatment is based on reasonable differences between the two classes. That is, the detainees under the two statutes are not similarly situated since the former statute contemplates detainees who have been free on bond and, while free, committed a felony; whereas the latter statute contemplates, among others, detainees like defendant herein who was not free on bond and, even if out on bond, committed no felony while free.

Where one free on bail commits other crimes, these further crimes "will necessarily result in greater pressure to flee from the jurisdiction of the court or otherwise frustrate its lawful processes." *Rendel v. Mummert,* 106 Ariz. 233, 474 P.2d 824 (1970). Thus, it is rational for the General Assembly to provide that, if a defendant commits felonies while out on bail, the courts may expressly revoke defendant's bond or increase the amount of the bond to such a high level that defendant's bond is effectively revoked. And, as a counterbalance to this almost certain deprivation of liberty, it is equally rational for the General Assembly to provide that that pretrial confinement, precisely because it is so certain, may not extend for longer than ninety days.

In contrast to a defendant whose bond is determined under § 16–4–103, C.R.S. (1983 Cum.Supp.), a defendant whose bond is determined under § 16–4–107, C.R.S. (1978 Repl.Vol. 8) has committed no additional felonies. Thus, any bond increase under § 16–4–107, C.R.S. (1978 Repl.Vol. 8) is likely to be far more moderate than that occasioned under § 16–4–103, C.R.S. (1983 Cum.Supp.). Therefore, any extended pretrial deprivation of liberty is far less certain under § 16–4–107, C.R.S. (1978 Repl. Vol. 8) than under § 16–4–103, C.R.S. (1983 Cum.Supp.) and, consequently, so is the need for the protection of a ninety-day speedy trial provision.

■ Given the non-suspect nature of the class against which defendant claims the statute at issue discriminates, and giv-

en the rational relationship which § 16–4–107, C.R.S. (1978 Repl.Vol. 8) bears to the legitimate state interests of insuring defendant's appearance at trial, while seeking to minimize pretrial detention and preserve the liberty of unconvicted persons, we hold that the statute here at issue is constitutional.

## II.

Defendant's second contention is that he was deprived, in three distinct ways, of his constitutional and statutory rights to trial by a panel of impartial jurors. We disagree.

## A.

In support of his contention, defendant's first argument is that the trial court erred in denying defendant's challenges for cause of jurors Hammer, Coon, and Bishop. Although juror Hammer remained on the jury as an alternate, he was excused at the end of the trial. Neither juror Coon nor juror Bishop remained on the jury because defendant exercised peremptory challenges to excuse both. Defendant exhausted all of his peremptory challenges.

■ The competence of potential jurors is a matter reserved to the sound discretion of the trial court. *Morgan v. People*, 624 P.2d 1331 (Colo.1981); *Nailor v. People*, 200 Colo. 30, 612 P.2d 79 (1980). Consequently, we will not reverse the decision of the trial court to deny certain challenges for cause absent a "manifest abuse of discretion." *People v. Taggart*, 621 P.2d 1375 (Colo.1981).

■ The denial of defendant's challenge for cause of juror Hammer could not have prejudiced defendant since he did not participate in the verdict. Therefore, defendant's right to an impartial jury panel was not violated by the court's ruling with respect to Hammer.

■ As regards juror Coon, defendant contends that she was unfit to serve on his jury because: (1) Coon knew several of the police officers listed as witnesses in the case, (2) Coon had prior knowledge of the shooting which she acquired through a newspaper account and through one of the officers mentioning it to her at the Aurora Municipal Court, where she was a clerk, and (3) Coon stated that if she were the defendant, she might not want a person like her on the jury. Upon review of the record of Coon's voir dire, however, it becomes evident that none of these facts rendered Coon an impermissibly biased or prejudiced person, unfit to serve on defendant's jury.

The record shows, first, that Coon had only a passing acquaintance with various police officers in Aurora and that she never discussed their cases or work with them. Coon stated that any familiarities with the faces of any officers who might testify would not affect her impartiality. Further, she stated that, through her work as a court clerk, she had the same casual acquaintance with defense attorneys as she had with police officers.

■ Second, the record shows that Coon had no recollection of any of the details of the shooting and that she stated she would "have to" base her decision on defendant's case solely on the testimony and evidence presented at trial "because what I read or heard has been so long ago, I don't really remember." Therefore, Coon's exposure to pre-trial publicity did not compel her disqualification, since she was not only willing, but forced, to set aside any pre-existing impressions of the defendant and the crime. *Cf. People v. Gurule*, 628 P.2d 99 (Colo.1981).

■ Third, the record reveals Coon's statement that, if her own prior recollection of the facts of the shootings were revived at trial and they differed from the facts as related from the witness stand, she would decide the case based on the evidence presented from the witness stand. Especially under these circumstances, Coon's sentiments to the effect that, were she the defendant, she might not want someone like her in the jury box, did not diminish her fitness as a juror in this case. *See People v. Taggart, supra.*

As regards juror Bishop, defendant contends that she was unfit as a juror because: (1) Bishop was exposed to pre-trial publicity about the case and recalled that the crime had been committed by a K-Mart employee who had been fired, and (2) Bishop "expressed some doubt" as to whether she could erase these preconceptions from her mind and decide the case on the evidence. Again, such facts alone are not sufficient to sustain a challenge for cause.

█ The record shows that Bishop had not formed an opinion as to defendant's guilt or innocence. Furthermore, in response to questioning by the court, Bishop stated unequivocally that she would decide the case on "the evidence and instructions of law as the Court gives them," rather than on something she might have read eight or nine months ago. Hence, Bishop was not disqualified by any partiality or bias from serving on defendant's jury. *See People v. Taggart, supra.*

### B.

Defendant's argument that the trial court erred in denying his motion for 15 peremptory challenges is also without merit.

█ The number of peremptory challenges allowed is governed by the statute and rule in effect at the time voir dire is conducted, rather than by the law existing at the time of the commission of the offense. *People v. Marquiz,* 685 P.2d 242 (Colo.App.1984); *People v. Priest,* 672 P.2d 539 (Colo.App.1983). Voir dire in defendant's trial was conducted on December 7, 1981. Therefore, § 16–10–104, C.R.S. (1983 Cum.Supp.) (effective July 1, 1981) and Crim.P. 24(d) (effective July 16, 1981) which specify 10 peremptory challenges in capital cases are dispositive, and the trial court properly refused to grant 15 peremptory challenges. *People v. Marquiz, supra; People v. Priest, supra.*

1. This case provides a detailed explanation of the California and Massachusetts approach as articulated in *People v. Wheeler,* 22 Cal.3d 258,

### C.

Defendant's next argument is that the trial court erred in denying his motion, during voir dire, for mistrial and quashing of the jury panel on the grounds that the People made unconstitutional use of its peremptory challenges to "systematically exclude minority group members from the jury." Specifically, defendant claims that the prosecution's use of three of its peremptory challenges to excuse Spanish surnamed persons was constitutionally impermissible. We disagree.

Defendant grounds his argument on cases from California and Massachusetts, both of which apply their own respective state constitutions. However, as defendant correctly notes, Colorado has adopted neither the California nor the Massachusetts approach. *See People v. Smith,* 622 P.2d 90 (Colo.App.1980).[1] We now make explicit our refusal to adopt either the California or Massachusetts views on peremptory challenges.

Our reasons for rejecting the California/Massachusetts approach are twofold. First, we believe that such an approach is not only not required by our federal or state constitutions, but also that it is contrary to over 300 years of common law jurisprudence in England as well as in this country.

Second, we perceive that application of the Massachusetts/California approach would present insurmountable problems of workability. Each case would become subject to a "trial within a trial" on such issues as whether each peremptorily challenged juror's occupation, demeanor, particular statements, negative facial expressions or even pupil dilations are "proper" grounds for exercise of a peremptory challenge. Every exercise of a peremptory challenge by the prosecution and the defense of a member of a "cognizable group" would be under attack on appeal. Add to this litigation concerning what constitutes a "cognizable group" and the result would be to

148 Cal.Rptr. 890, 583 P.2d 748 (1978) and *Commonwealth v. Soares,* 377 Mass. 461, 387 N.E.2d 499 (1979).

impose an intolerable burden on limited judicial resources with only a highly questionable improvement in the quality of justice.

Accordingly, we embrace instead the rule set forth in the United States Supreme Court's opinion in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), noting that a majority of the Illinois Supreme Court also prefers *Swain*. *People v. Payne*, 99 Ill.2d 135, 75 Ill.Dec. 643, 457 N.E.2d 1202 (1983). In *Swain*, the United States Supreme Court considered, under the Equal Protection Clause, the propriety of prosecutorial exercise of peremptory challenges to exclude members of a minority group from a particular criminal jury.

The Court's analysis in *Swain* began with sixteenth century English common law and noted that at one time only the defendant was allowed to exercise peremptory challenges. Three hundred years ago, peremptories on both sides became the settled law of England which law was later incorporated into the federal law of this country and the law of each state.

Although the right to peremptory challenges is not constitutionally required, it is recognized as one of the most important rights afforded to the accused. Indeed, drawing upon Blackstone's commentaries, the Court in *Swain* recognized the function of the challenge as one affording an appearance of justice to all parties and allowing protection against the seating of a hostile juror where challenge for cause was unsuccessful.

Finally, the Court in *Swain* warned that judicial scrutiny of the prosecution's exercise of the peremptory challenge would effectively sound the death knell of the peremptory challenge as we know it. The challenge, if required to be justified, would no longer be "peremptory." As the high court in *Swain* so ably elucidated:

"The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control.... In light of the purpose of the peremptory system ..., we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes. Any other result, we think, would establish a rule wholly at odds with the peremptory challenge system as we know it."

In sum, the peremptory challenge is a paramount right of both the defendant and the People. To the defense:

"The right to challenge a given number of jurors without showing cause is one of the most important rights secured to the accused.... Any system for the impaneling of a jury that prevents or embarrasses the full, unrestricted exercise by the accused of that right, must be condemned." *Pointer v. United States*, 151 U.S. 396, 14 S.Ct. 410, 38 L.Ed. 208 (1893).

As the eminent jurist Lord Coke wrote:

"The end of challenge is to have an indifferent trial ... and to bar the party indicted of his lawful challenge is to bar him of a principal matter concerning his trial." 3 Inst. 27, chap. 2.

To the people, the peremptory challenge is equally essential. For "the view in this country has been that the system [of peremptory challenges] should guarantee not only 'freedom from any bias against the accused, but also from any prejudice against the prosecution. Between [the defendant] and the state the scales are to be evenly held.'" *People v. Williams*, 97 Ill.2d 252, 73 Ill.Dec. 360, 454 N.E.2d 220 (1983), quoting *Hayes v. Missouri*, 120 U.S. 68, 7 S.Ct. 350, 30 L.Ed. 578 (1887).

In light of the inherent value to both the defendant and the People of the peremptory challenge, we refuse to cripple either party in its use of such an important tool by requiring that each party justify with "good cause" every exercise of its right. Accordingly, applying *Swain* to the facts before us, we perceive no error in the use of peremptory challenges in defendant's trial.

### III.

Defendant's third contention is that the trial court erred in admitting the testimony of defendant's co-worker regarding defendant's threatening expressions of ill will toward Clunie some four to five months prior to Clunie's murder. Defendant argues that the probative value of his statements to the co-worker was outweighed by its possible prejudicial effect because of the "remoteness in time" and, thus, that the testimony should have been excluded under CRE 403. We do not agree.

"[E]vidence of prior threats or an antecedent grudge borne by the defendant against the victim is competent in a murder prosecution to show motive, malice, or ill will between the victim and the defendant," *People v. Gladney,* 194 Colo. 68, 570 P.2d 231 (1977), *cert. denied,* 434 U.S. 1038, 98 S.Ct. 776, 54 L.Ed.2d 787 (1978). The length of time between the threat and the commission of the murder affects the weight, rather than the admissibility, of the evidence of the threat. *People v. Lazare,* 189 Colo. 530, 542 P.2d 1290 (1975). Hence, threats made six to nine months prior to the murder, *People v. Lazare, supra;* threats made one year prior to the murder, *Babcock v. People, supra;* threats made 17 months prior to the murder, *Rice v. People,* 55 Colo. 506, 136 P. 74 (1913); and threats made five years prior to the murder, *Berger v. People,* 122 Colo. 367, 224 P.2d 228 (1950), have all been held to be admissible.

Here, we agree with the trial court that the probative value of defendant's threats was not outweighed by any possibility of prejudice due to remoteness in time. Therefore, the trial court was correct in admitting the testimony.

### IV.

Defendant's next contention is that he did not learn until the day before Jay Davis testified that the prosecution intended to call him as a witness and that, therefore, the trial court abused its discretion in denying defendant's request for a continuance for the purpose of obtaining a psychiatric evaluation of Davis. We disagree.

As a result of the gunshot wounds inflicted by defendant, Davis was in a coma and was hospitalized from mid-March until October 25, 1981, when he was released from the hospital. The only medical report in the possession or control of the prosecution was the report of a Dr. Samuelson of October 6, 1981, which stated that, as of that time, Davis' condition was still "up in the air." However, after Davis' release in late October, his recovery accelerated at home and the prosecution, having previously endorsed Davis as a witness, made its final decision about two weeks prior to trial to call him to testify.

Because of defense counsel's claim that he was unprepared for Davis' testimony, the trial court did grant a recess to allow defense counsel to interview Davis and Dr. Samuelson. Samuelson, however, did not testify at trial. In addition, the trial court granted defendant's request for appointment of an expert to examine the psychiatric report on Davis overnight. The court warned, however, that no continuance would be granted.

The grant or denial of a motion for a continuance is within the sound discretion of the trial court. *Miller v. People,* 178 Colo. 397, 497 P.2d 992 (1972). There was no abuse of that discretion here because, as defendant concedes, Davis had been an endorsed witness prior to trial. The prosecution did not at any time tell the defense that Davis would not be called to testify. Hence, the responsibility for defendant's incorrect assumption that Davis would not testify because of his serious

injuries can rest nowhere but with the defendant.

In light of the record before us, the trial court did not abuse its discretion in its denial of a continuance.

## V.

Defendant's fifth contention is that, based on evidence presented at an *in camera* hearing on Davis' competency, Davis was incompetent to testify because of traumatically induced memory loss and, therefore, it was error for the trial court to allow him to testify. Again, we disagree.

The defendant has the burden of proving the incompetency of an opposing witness by "clear and convincing evidence." *Howard v. Hester,* 139 Colo. 255, 338 P.2d 106 (1959). If a witness has the capacity to observe, recollect, communicate and understand the oath to tell the truth, he is competent to testify and any mental deficiency is considered only insofar as it affects the weight to be given his testimony. *Howard v. Hester, supra; People v. Coca,* 39 Colo.App. 264, 564 P.2d 431 (1977).

Here, the record corroborates the trial court's conclusion that Davis possessed these requisite capacities. During the competency hearing, Davis discussed his injuries, treatment, and current medical status. Although Davis could remember nothing about the moment of the shooting itself, he was able to recall the events just prior to that moment and had long term memory of more distant events, including his association with the defendant. In addition, Davis accurately explained the meaning of the oath to tell the truth.

Defendant argues, specifically, that Davis' inability to recollect many of the circumstances of his K-Mart employment, including anything about the shooting incident, conclusively rendered Davis incompetent to testify. However, such is not the law. For even adjudication of the insanity of a witness does not conclusively render that witness incompetent to testify. *People v. Coca, supra.*

On the contrary, where even a slight opportunity for observation is shown, the witness is competent to testify as to what he did observe, *U.S. v. Alden,* 476 F.2d 378 (7th Cir.1973), regardless of any lack of certainty he might have, *U.S. v. Evans,* 484 F.2d 1178 (2d Cir.1973), and even if his recollection is vague or imperfect, *O'Shea v. Jewel Tea Co.,* 233 F.2d 530 (7th Cir.1956). A witness' testimony need not be complete or convincing, so long as it is not so illogical that it is incredible as a matter of law. *Wise v. Hillman,* 625 P.2d 364 (Colo.1981).

Here, defendant has failed to demonstrate Davis' inability to perceive, recollect, or communicate. Davis obviously had the opportunity to observe that about which he testified, and there is nothing so illogical about Davis' testimony which could justify any conclusion that he was incompetent as a matter of law.

There is a vast dichotomy between the threshhold *legal* determination of competency and the *factual* determination of credibility. Defendant's arguments here have spoken only to the latter determination, which is the sole province of the jury and which is a province we may not invade.

## VI.

Defendant next contends that the evidence of deliberation was insufficient to warrant the submission of first degree and attempted first degree murder charges to the jury. Once again, we disagree.

The term "after deliberation" as it is used in the first degree murder statute means: "That the decision to commit the act has been made after the exercise of reflection and judgment concerning the act." Section 18–3–101(3), C.R.S. (1978 Repl.Vol. 8). However, the length of time required for deliberation need not be long. *See People v. Sneed,* 183 Colo. 96, 514 P.2d 776 (1973). Therefore, the critical inquiry in this case is whether the evidence, when viewed in a light most favorable to the prosecution, is substantial and sufficient to permit a reasonable person to conclude beyond a reasonable doubt that the defendant's decision to kill Clunie and Davis was made after the exercise of reflection and

judgment. *See People v. Madson,* 638 P.2d 18 (Colo.1981).

 The element of deliberation can rarely be proven other than through circumstantial or indirect evidence. *People v. Madson, supra.* Such circumstantial proof may include evidence of the defendant's possession and use of a deadly weapon or of manifestations of ill will between the defendant and the victim. *People v. Madson, supra.* Here, some of both of these types of evidence was presented and, when viewed in the light most favorable to the prosecution, such evidence was indeed sufficient to submit the question of deliberation, in the context of first degree and attempted first degree murder charges, to the jury.

## VII.

Defendant contends, finally, that the cumulative effect of the alleged errors deprived him of his right to a fair trial, but since we have determined each of defendant's allegations of error to be without merit, we reject this contention. *People v. Marin,* 686 P.2d 1351 (Colo.App.1983).

Judgment affirmed.

BABCOCK, J., concurs.

KELLY, J., specially concurs.

KELLY, Judge, specially concurring.

I specially concur.

Although I agree with the result reached by the majority, in my view, this case does not require that we make a choice between *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) and *People v. Wheeler,* 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978). *See also Commonwealth v. Soares,* 377 Mass. 461, 387 N.E.2d 499 (1979). Even if this court were to adopt the more liberal rule of *Wheeler,* here, as in *People v. Smith,* 622 P.2d 90 (Colo.App.1980), the defendant has been denied no right.

The record shows that there were four persons with Spanish surnames who were peremptorily challenged by the parties. One was excused by the defendant, and three were excused by the People. One of the three prospective jurors excused by the People stated on voir dire that when he had been discharged from employment, he felt like killing someone and could understand how someone in that situation might want to shoot somebody. The second prospective juror excused by the People had a good friend who had recently been charged with murder in Denver, the case was concluded, and the juror expressed disbelief that his friend was guilty of the offense. It is difficult to believe that any prosecutor would permit two such jurors to serve on the panel in a case such as this.

Although the People's reasons for excluding the third prospective juror are not clear, it is my view that the peremptory challenge of one juror does not equate with a "systematic" exclusion of minority group members. I am not ready either to "embrace" or to reject the reasoning in *Swain v. Alabama, supra,* on a record which does not compel us to address the issue. I adhere to the views expressed in *People v. Smith, supra.*